UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 1:12-cr-00027-JAW-1 |
| | ) | |
| CAROLE SWAN, | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON MOTION TO SUPPRESS**

Carole Swan filed a motion to suppress statements she provided to investigating officers. (Motion to Suppress, ECF No. 47.)  The statements in question were provided in the context of an un-Mirandized stationhouse interview.  The Court referred the motion pursuant to 28 U.S.C. § 636, requesting a report and recommendation.  A hearing was held on December 5, 2012.  Based on the proposed findings of fact and discussion that follow, I recommend that the Court deny the motion.

**PROPOSED FINDINGS OF FACT**

On February 3, 2011, Lieutenant Brian Reardon and Detective David Bucknam, Kennebec County sheriff's deputies, conducted a "sting" operation against Defendant Carole Swan, who was then a selectperson for the Town of Chelsea.  In the days leading up to their operation, the deputies conferred with, among others, informant/witness Frank Monroe, owner of Frank Monroe Construction.  Frank Monroe informed the deputies that Carole Swan approached him and asked him to submit an inflated bill to the Town of Chelsea for road sand.  Monroe told them that Swan sought a kickback of $10,000 in exchange.  Reardon and Bucknam installed a recording device on Monroe's phone and overheard conversations in which Swan pursued this

scheme with Monroe.  During these calls Swan professed reluctance to talk much on the phone, expressing a concern that her phone might be bugged.

The Sheriff's Office arranged for Monroe to submit a false sand invoice to Chelsea in the amount indicated by Swan.  Following Monroe's submission of the bogus invoice, Chelsea authorized an appropriate warrant item and a check issued for payment of the invoice.  On February 3, Swan collected the check and informed Monroe that he could pick it up from the mailbox located at the end of her driveway.   Monroe did so, while the deputies monitored him. After securing the check, the deputies provided Monroe with a bundle of bills in a Kennebec Savings Bank bag.  They then followed Monroe as he went to the Kennebec Savings Bank to create the appearance that he was going to cash the check, in case Swan was somehow monitoring Monroe.  Monroe emerged from the bank and proceeded to a prearranged location to deliver the bag of cash to Swan.  The deputies monitored this transaction and then followed Swan's vehicle into the parking lot of a nearby laundry, where Swan went to pick up some clothing.  The laundry had a small parking lot, which was reduced in size due to sizeable snow banks.

After parking in the laundry's lot, Swan exited her vehicle, closed her door, and proceeded toward the laundry.  At roughly the same time, the deputies parked their vehicle behind and slightly to the side of Swan's vehicle.  More likely than not, the placement of their vehicle and the presence of snow banks would have prevented Swan from backing out of the parking lot, but she was presently walking toward the laundry.  The deputies stepped out of their vehicle and approached Monroe when she was about half way to the laundry and within several paces of her vehicle.  Lieutenant Reardon called out "Carol" and Swan turned to face the

deputies as they approached.  They stopped roughly six feet[1] from Swan and Lieutenant Reardon stated, "I want my money back."

Swan quickly appreciated that the men approaching her were police officers because Lieutenant Reardon displayed a badge.  In response to Reardon's request to get the money back, Swan volunteered that she was owed money from Frank Monroe.  Reardon repeated that he wanted his money back.  Swan walked a few paces back to her vehicle and retrieved the package and handed it to Reardon.  She then asked, "Am I in trouble?"  Reardon said that the parking lot was not the best place to discuss the matter and suggested that they talk at the sheriff's office.  Swan expressed her willingness to do so, probably by saying "okay," or words to that effect, though it was not clear what words she used.  In any event, I do not find that Reardon instructed Swan that she should proceed to the sheriff's office or that he required that Detective Bucknam accompany her in her vehicle.  Rather, there was a discussion about how to get to the office and where to park.[2]  Someone suggested that Bucknam ride with Swan in her vehicle; as a possibility, not as a command.  Swan indicated that that would be fine and got back into her vehicle.  Detective Bucknam climbed into the passenger seat and they proceeded to the Sheriff's Office after Reardon, who went on to the sheriff's office ahead of them.  This trip took no more than a couple of minutes.

---

[1]     I do not credit Swan's testimony that she was crowded by the deputies or that they trapped her between themselves and the open door of her vehicle.  Although Reardon placed the distance somewhat closer than Bucknam did, neither indicated that they were invading Swan's space and Bucknam likely estimated a greater distance because he was standing slightly to Reardon's side and Reardon was the one doing the talking.

[2]     The deputies testified that Swan appeared confused at this point and that they questioned whether she knew how to get to the sheriff's office.  Swan testified that she knew very well where the office was because she had been there for county commissioner meetings.  This presumably was an effort on her part to raise doubt about the deputies' credibility.  However, the deputies' testimony was the more credible.  Swan's face likely did show an expression similar to confusion, though it may well have been the product of an internal deliberation about how best to proceed rather than confusion as to the location of the sheriff's office.  Moreover, Swan's own testimony reflects that Bucknam directed her to an area of the sheriff's office parking lot that she had never before entered.  This likely was a primary reason why it was suggested that he ride with her.  I found her testimony about most events highly strategic in nature and less than reliable.

The parking lot encounter was not recorded, though the deputies did have a handheld camera with video capability in their possession that day. Reardon testified that use of the hand-held camera during this encounter would have been awkward and I found this statement reasonable under the circumstances. It is uncontested that neither deputy drew his sidearm, threatened Swan, or used harsh language during this encounter.

Prior to leaving for the sheriff's office, Detective Bucknam took possession of Swan's cell phone. Swan testified that she pulled the phone out of her pocket when the deputies first approached her in the parking lot and that "they" abruptly grabbed it out of her hand. I do not credit this testimony. Swan stated that her phone was in her pocket when she exited her vehicle and this much I do credit. I find that the phone most likely came out of her pocket sometime shortly before entering her vehicle and that Detective Bucknam took it into his possession at that point, before entering Swan's vehicle.

The drive to the sheriff's office was uneventful. When they arrived at the sheriff's office, Bucknam directed Swan where to park and then led her into an entrance where Reardon was waiting. From there, the deputies escorted Swan down a hall and admitted her into an interview room. From this point forward, a 95-minute interview is captured on video.

Swan's manner during the videotaped interview reflects a relatively tractable personality. It is in part based on her calm and resignation depicted in the video that I find it more likely than not that she readily consented to the suggestions made by Reardon to talk at the sheriff's office and for Bucknam to ride along with her.

After Swan was seated at a chair in the interview room, Reardon entered and closed the door. Before closing the door, Lieutenant Reardon explained that the door was being closed for privacy, that Swan was not under arrest, and that she was free to get up and walk out if she so

chose.  From there, he explained that it was very important for her to talk about what happened, a proposition that she agreed with quite readily.  Reardon then exited and Detective Bucknam entered to sit at the desk and take personal information.  Swan inquired whether she could have her cell phone back.  Bucknam said yes, that he would not be keeping it, but that he did not want her to get distracted during their discussion.  He asked if he could get her something, presumably to drink, and she declined.  From there a generally even-tone back and forth transpired in which Bucknam explained that Swan had been caught on recordings, including video, and that this was the reason they were sitting there.  During this exchange, Reardon re-joined them and took a seat.  He asked whether Swan wanted to help herself and for them to help her.  She said yes.  He explained that what had been going on has to stop now and that he wanted to understand how involved "the other players" were and to get a "ballpark figure" of the amounts involved.  Reardon left the room and let Bucknam took over.

From there, Swan offered a collection of inculpatory statements that will not be recounted here.  During the interview, Swan's cell phone rang on one occasion.  Swan gestured to receive her phone, but Bucknam said that he was "just going to hit the thing, let it go to voicemail."  Swan said, "Okay," and the interview continued, with Reardon occasionally leaving and entering.  Before offering much in the way of a confession, Swan sought some indication of how her cooperation would help her and Bucknam informed her that they were not with the district attorney's office and could not make any guarantees.  He clearly stated, among other things, "I can't promise you nothing," but opined that the district attorney would hear of her cooperation and would make a decision based on what she did.  At roughly the 74th minute of the interview, Reardon gave Swan her cell phone so she could place a call to her husband.  She dialed and they stated that she could place her call outside if she wished.  After a brief conversation with her

husband, Swan knocked on the door through which the deputies exited and they returned to the room for an end-of-interview exchange, including some indication of what would happen next. During this exchange, Swan thanked the deputies for trying to help her.

### DISCUSSION

"In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment . . . commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'" Bram v. United States, 168 U.S. 532, 542 (1897). In Miranda v. Arizona, the Supreme Court established "rules of police procedure applicable to 'custodial interrogation.'" Oregon v. Mathiason, 429 U.S. 492, 494 (1977). It held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). From there, the Court prescribed the classic "Miranda warning," requiring that any custodial interrogation be preceded with cautionary advice that the suspect has "a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. The Miranda warning was deemed necessary to combat the "'compelling pressures' inherent in custodial police interrogation" and safeguard the Fifth Amendment. Dickerson v. United States, 530 U.S. 428, 440 (2000) (quoting Miranda, 384 U.S. at 467). Consequently, "[s]tatements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322

(1994) (comparing the holding of <u>Miranda</u> with the holding of <u>Harris v. New York</u>, 401 U.S. 222, 226 (1971)[3]).

For Miranda warnings to be required there must be a custodial scenario.  Non-custodial questioning does not require a warning.  <u>Mathiason</u>, 429 U.S. at 495;  <u>United States v. Hughes</u>, 640 F.3d 428, 435 (1st Cir. 2011);  <u>United States v. Quinn</u>, 815 F.2d 153, 160 (1st Cir. 1987).  Thus, for Swan's motion to succeed, it must be apparent that she was in custody at the time of her unwarned statements.

For a suspect to be "in custody," she must be subject to either formal arrest or an equivalent restraint on her freedom of movement.  <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983);  <u>Mathiason</u>, 429 U.S. at 495.  The restraint imposed on a suspect's movement need not be physical.  Custody may arise where the suspect is "otherwise deprived of his freedom of action in any significant way," including through the imposition of psychological pressures. <u>United States v. Rogers</u>, 659 F.3d 74, 77 (1st Cir. 2011) (quoting <u>Miranda</u>, 384 U.S. at 444). "Significant deprivation occurs in circumstances carrying a 'badge of intimidation,' or 'inherent compulsions,'" <u>id.</u> (quoting <u>Miranda</u>, 384 U.S. at 457, 467), "or as the Supreme Court later put it, in circumstances that 'blur[] the line between voluntary and involuntary statements, and thus heighten[] the risk' that the Fifth Amendment privilege will not be appreciated," <u>id.</u> (quoting <u>Dickerson</u>, 530 U.S. at 435).  "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation[.]"  <u>Stansbury</u>, 511 U.S. at 322. Two objective tests are prescribed to assist in the task of differentiating between scenarios that would, or would not, be custodial in nature.  Initially, courts consider "whether a reasonable person in the circumstances would have felt 'at liberty to terminate the interrogation and leave.'"

---

[3]     "The shield provided by <u>Miranda</u> cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.  We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements."  <u>Harris</u>, 401 U.S. at 226.

Id. (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)).  If not, then the second inquiry is "whether those circumstances would have been likely to coerce a suspect to engage in back and forth with the police, as in the paradigm example of traditional questioning."  Id. (quoting Berkemer v. McCarty, 468 U.S. 420, 436-37 (1984)).  Because Swan was not in custody, she was not entitled to the Miranda warning.

Swan contends that her statements to the deputies must be suppressed because she did not receive the Miranda warning.  (Motion to Suppress at 3.)  She argues that she was in custody because she was deprived of comfortable surroundings and was taken to a location unfamiliar to her.  She also contends that her arrival at the sheriff's office interview room was compelled and not voluntary.  My proposed findings are in conflict with Swan's factual premise.  Based on the evidence presented at the hearing, Swan was not ordered or instructed to talk with the deputies but rather responded willingly to the suggestion that she talk to them and that they have their conversation at the nearby sheriff's office rather than outside in a parking lot.  Swan understood that her predicament was not good and that the deputies would believe they had caught her red handed and this likely influenced her decisions.  However, Swan's expression of a willingness to talk and to travel to the sheriff's office to do so was not the product of compulsion and she was never placed under formal arrest or directed to comply.

Swan argues that circumstances were like a formal arrest because Detective Bucknam took possession of her phone and she was effectively "cut off" from outside communication once she was in the company of the deputies.  (Id. at 6.)  She cites United States v. Madoch, 149 F.3d 596, 601 (7th Cir. 1998).  In Madoch, multiple agents served a warrant at the appellant's premises and ordered her into her kitchen while they arrested her husband.  One agent reached for his gun during this exchange while others ran through the house yelling.  The agents later

8

instructed appellant not to answer her phone, which rang numerous times.  They also detained appellant for five-and-a-half hours while they questioned her.  Id. at 600.  The court said that a reasonable person would not have felt free to end a conversation with the agents or to leave their presence.  In particular, the court was moved by the fact that appellant was not even allowed to "attend to the fairly intimate task of expressing her breast milk in private" without having a female agent in her presence.  Id. at 601.

In the instant case, the totality of the circumstances does not describe a custodial scenario.  During the initial encounter in the parking lot, any statements attributable to Swan were not the product of a custodial interrogation because the officers approached Swan in a public setting, did not employ any show of force, and expressed a desire to talk with her about their investigation at the sheriff's office.  Although it is not clear what may have transpired had Swan declined the invitation to talk at the sheriff's office, it ultimately does not matter because Swan expressed a willingness to speak with the deputies at the office and she did so under circumstances that would not have made a reasonable person feel that she had lost her freedom to choose otherwise.  The only directive that Swan received during this initial encounter was the indication from Lieutenant Reardon he "wanted his money back."  A reasonable person would have understood that in this one respect Reardon would not accept no for an answer.  But this one directive did not beget a custodial scenario.

Swan also maintains that the unilateral collection of her cell phone changed the nature of the interview and would have caused a reasonable person to believe that she was not free to leave.  I have found that Bucknam collected Swan's phone following the agreement to continue the conversation at the sheriff's office.  I do not accept Swan's testimony that the phone was forcibly snatched from her hand.  The collection of the phone would not have prevented a

reasonable individual from reconsidering her willingness to participate in an interview.  Nor would it have made a reasonable person believe that she could no longer exercise freedom of movement or action in a manner inconsistent with compliance.  The temporary loss of possession of the cell phone was in the nature of a condition placed on Swan's participation in a voluntary interview.  As Bucknam later told Swan in the interview room, he did not want her being distracted by her cell phone while they were talking.  A reasonable person faced with the same circumstances would have appreciated that police authorities conducting an interview at the police station would request, expect, or even require the surrender or deactivation of a cell phone for the duration of an interview.  This is the kind of expectation that many people place on their house guests, for example, and it is unreasonable to conclude that such a condition automatically generates a custodial scenario whenever it is imposed by a law enforcement officer.  A reasonable person in Swan's position would not have felt unable to object or unable to terminate the interview, particularly as Reardon initiated the office interview by explaining that Swan was free to go if she so chose.

Finally, Swan characterizes the interview room and the interview style as inherently custodial and compulsory.  The characteristics of the room and the questioning are preserved on the video recording.  Neither the room nor the questions were the sort that would have caused a reasonable person to believe she was under arrest or was subject to an equivalent restraint.  It is well established in the law that "[e]ven when questioning occurs in the stationhouse, a suspect need not be given Miranda warnings if he went there voluntarily and there was no such restriction on his freedom as to render him in custody."  Quinn, 815 F.2d at 160 (internal quotation marks omitted).  See also Oregon v. Mathiason, 429 U.S. 492, 495 (1977) ("Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station

house, or because the questioned person is one whom the police suspect."). So it is in this case. Swan went to the sheriff's office willingly to participate in a police interview. She did so because she believed it was in her best interest, not because she was subjected to a restraint equivalent to formal arrest, whether physical or psychological or some combination of the two. Although "an officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned," such words and deeds "are relevant only to the extent that they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" Stansbury v. California, 511 U.S. 318, 320 (1996) (quoting Berkermer, 468 U.S. at 440).

Lastly, Swan argues that her statements were involuntary. (Motion to Suppress at 7-8.) This separate inquiry is necessary because, whether warned or otherwise, a confession cannot be used if it is obtained by police through coercive tactics that override a suspect's will, such that the resulting confession is, in fact, involuntary. "The voluntariness of an admission depends on 'whether the will of the defendant [was] overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances.'" United States v. Jackson, 918 F.2d 236, 241 (1st Cir. 1990) (quoting Bryant v. Vose, 785 F.2d 364, 367-68 (1st Cir. 1986)). The facts in this case do not divulge any coercive police activity, which undermines Swan's contention that her statements were not voluntarily given. Colorado v. Connelly, 479 U.S. 157, 167 (1986) (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment").[4]

---

[4]       Swan does not brief the voluntariness issue in detail, leaving the court to decide which aspects of the interview Swan might consider most coercive. I presume she may be referring to statements related to the future consequences of her acts and her cooperation. As Judge Torresen recently observed:

## CONCLUSION

For the reasons set forth above, I recommend that the Court adopt the proposed findings of fact and deny Defendant Carole Swan's motion to suppress (ECF No. 47).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

December 12, 2012

---

"A promise to bring any cooperation on the part of the defendant to the prosecuting attorney's attention does not constitute a coercive promise sufficient to render any subsequent statements involuntary and inadmissible." United States v. Baldacchino, 762 F.2d 170, 179 (1st Cir. 1985). Nor is a truthful and non-coercive assessment of the possible penalties a defendant faces a threat. United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir. 1978) ("A truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will.")  See also United States v. Mashburn, 406 F.3d 303, 310 (4th Cir. 2005) (telling suspect of gravity of suspected offense is not unduly coercive).

United States v. Genao, 2:12-cr-00090-NT, 2012 U.S. Dist. Lexis 170941, *15-16, 2012 WL 6018719, *6 (D. Me. Dec. 3, 2012).  The circumstances in the instant case reflect that Swan's statements were voluntary.