UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA )
                         )
        v.               )        1:12-cr-00027-JAW-01
                         )
CAROLE SWAN               )

## ORDER DENYING EMERGENCY MOTION FOR
## RELEASE PENDING APPEAL

Despite Carole Swan's hyperbolic language and charges, the Court denies her earnest demand for immediate release pending appeal because she has failed to demonstrate that her appeal is not for purposes of delay and that it raises a substantial question of law likely to result in reversal or an order for a new trial under 18 U.S.C. § 3143(b)(1)(B).

## I.    BACKGROUND

On July 26, 2013, a federal jury found Carole Swan guilty of five counts of making false statements in her federal income tax returns and guilty of two counts of making false statements to obtain federal workers' compensation benefits. *Jury Verdict Form* (ECF No. 167). On September 17, 2013, a second federal jury found Ms. Swan guilty of three counts of Hobbs Act extortion. *Jury Verdict Form* (ECF No. 273). On June 17, 2014, the Court sentenced Ms. Swan to 87 months imprisonment on the Hobbs Act extortion counts, 36 months imprisonment on the tax counts, and 60 months imprisonment on the workers' compensation counts, all to be served concurrently. *J.* (ECF No. 358). At the close of the sentencing hearing, upon Ms. Swan's request, the Court imposed a report date of August 15, 2014 by 2:00 p.m. to

surrender for service of sentence at the institution designated by the Bureau of Prisons. *Id.* at 2.

On July 21, 2014, Ms. Swan filed an expedited motion for bail pending appeal. *Expedited Mot. for Bail Pending Appeal* (ECF No. 373). The Government filed an objection on the same day. *Gov't's Opp'n to Def.'s Expedited Mot. for Bail Pending Appeal* (ECF No. 374). Ms. Swan replied on July 22, 2014. *Reply to United States' Resp. to Expedited Mot. for Bail Pending Appeal* (ECF No. 375). On July 24, 2014, the Court denied the expedited motion because Ms. Swan had failed to sustain her burden to demonstrate that she intends to raise a "substantial question of law or fact" as to her tax and workers' compensation fraud convictions on appeal. *Order Denying Mot. for Release Pending Appeal* at 4 (ECF No. 376).

On September 30, 2014, Ms. Swan filed what she termed an emergency motion for release, again requesting that the Court release her on bail pending appeal. *Appellant's Emergency Mot. for Release Pending Appeal Pursuant to FRAP Local Rule 9(b), 18 USC [§] 3143(b) and 3145(c) and* Riley v. California, 134 S. Ct. 2473 (June 2014) (ECF No. 386) (*Def.'s Mot.*). On October 1, 2014, the Government filed its opposition to the motion. *Gov't's Opp'n to Def.'s Second Emergency Mot. for Release Pending Appeal* (ECF No. 387) (*Gov't's Opp'n*). On October 6, 2014, Ms. Swan filed a reply. *Appellant's Reply to the New Matters Raised in the Gov't's Opp'n* (ECF No. 388) (*Def.'s Reply*).[1] On the same day, the Government filed a sur-reply. *Gov't's Resp. to*

---

[1] On October 10, 2014, Ms. Swan filed an errata notice, correcting the citation for *United States v. Garcia*, 340 F.3d 1013 (9th Cir. 2003). *Errata Notice Re: Appellant's Reply Docket 388* (ECF No. 390).

*Def.'s Reply to the New Matters Raised in the Gov't's Opp'n* (ECF No. 389) (*Gov't's Sur-reply*).

## II.     THE PARTIES' POSITIONS

### A.     Carol Swan's Motion

Carol Swan argues that the Court should release her on bail pending the appeal of her convictions. *Def.'s Mot.* at 1-20. In her motion, Ms. Swan criticizes the Court's July 24, 2014 decision to deny her first emergency motion for bail. She says that the Court denied the motion because it "adopted the Government's response that Carole's motion only concerned the Hobbs Act convictions," which were part of the September trial. *Def.'s Mot.* at 1. In fact, she instructs, "the incriminating statements were admitted as evidence against Carole at both [the July and September] trials." *Id.* (citing the exhibit lists for both trials).

Turning to the standards for release under 18 U.S.C. § 3143(b)(1)(A) and (B), Ms. Swan contends that she is unlikely to flee or to pose a danger to the community and that she is pursuing a meritorious appeal. *Id.* at 2-3. Regarding the first issue, she maintains that she complied with the conditions of her release, appeared for all court hearings, and self-reported to prison. *Id.* at 3. She notes that she has paid all fines and restitution in full. *Id.* She says she has no prior criminal history and has lived her entire life in the greater Augusta area of Kennebec County, Maine, where members of her immediate family live. *Id.*

As for the merits of her appeal, she observes that her "unwarned and un-counseled statements were admitted as evidence in both trials." *Id.* at 4. Ms. Swan

focuses on the denial of her motion to suppress the statements she made to the police at the Kennebec County Sheriff's Office on February 3, 2011. *Id.* She asserts that "the author of the recommended decision . . . omitted and/or misconstrued salient facts that support the finding that Carole was placed in custody in the parking lot and that her statements were involuntary." *Id.* Ms. Swan argues that the Magistrate Judge applied the wrong standard, namely a subjective, not an objective standard in assessing whether an "objective reasonable person placed in the same circumstances" would believe he or she was in custody. *Id.* at 5. Ms. Swan says that her "freedom of movement (freedom to leave) was restricted in the parking lot and continued to be restricted until released from the sheriff's station." *Id.*

She also claims that her statements were involuntary because the deputies overbore her will and "she submitted to the intimidation and pressure and proceeded to describe her role in the offense." *Id.* at 6. She complains that the Magistrate Judge "failed to consider that offense-specific questions were directed at Carole, questions which the officers should have known would evoke an inculpatory response in violation of *Rhode Island v. Innis*, 446 U.S. 291, 330-01 (1980)." *Id.* She also implies that this Court failed to perform its statutory obligation to conduct a de novo review of the Magistrate Judge's recommended decision and admitted as much at trial when it allegedly said that it had "not read the entire transcript of the audio portion of the interview." *Id.* at 4 n.1.

Finally, she asserts that the police searched her cellphone without a search warrant in violation of *Riley*. *Id.* at 7.

## B.    The Government's Opposition

The Government opposes her release. *Gov't's Opp'n* at 1-7. The Government maintains that Ms. Swan poses a danger to the safety of the community. *Id.* at 1. It says that she is "a corrupt public-official, three time extorter and a multi-year defrauder of two government programs." *Id.* at 1-2. It states that her "perjury during these criminal proceedings was pervasive, a fact her counsel conceded at sentencing and that resulted in an obstruction of justice enhancement." *Id.* at 2. The Government asserts that Ms. Swan "sought to interfere with efforts to collect any fine imposed and mandatory restitution by conveying a $700,000 gravel pit she owned to her son after she was indicted." *Id.* Finally, it notes that contrary to her claims, she did in fact violate her pretrial release. *Id.*

Turning to the merits of Ms. Swan's appeal, the Government argues that the Magistrate Judge properly found that Ms. Swan was not in custody when she gave the interview at the Sheriff's Office on February 3, 2011. *Id.* at 2-6. The Government reviews the legal standards for determining whether a person is in custody and argues that the Magistrate Judge carefully considered the applicable legal standards and properly concluded both that Ms. Swan was not in custody and that her statements were voluntary. *Id.* It acknowledges that this Court "did indeed say it had not seen the whole transcript of the interview", but the Government points out that "[u]p to that point in the first trial, the full transcript (GX 11-T) had not been introduced and the court had not seen or admitted it." *Id.* at 7. Finally, the Government says that the *Riley* decision is inapplicable because Ms. Swan failed to

attempt to suppress evidence of a cellphone search and because no evidence admitted at trial contained data from her cellphone. *Id.* at 7.

### C. Ms. Swan's Reply

Ms. Swan contends that even though her trial defense counsel acknowledged that she had committed perjury, she decries his concession as "ethically questionable." *Def.'s Reply* at 2. She says that even if she did commit perjury, the Court granted her bail after its sentencing hearing and allowed her to self-report to prison, which she did. *Id.* at 1-2. Therefore, she argues, if her perjury did not prohibit her post-sentencing bail, it should not prohibit her bail pending appeal. *Id.* In support of her position, Ms. Swan cites *United States v. Farlow*, 824 F. Supp. 2d 189, 196 (D. Me. 2011), in which this Court found a convicted child pornographer did not pose a danger to the community, and contends that her crimes pose much less risk to the community than those convicted of violent acts against children.[2] *Def.'s Reply* at 2.

Turning to her argument under *Riley*, Ms. Swan dismisses as "patently incorrect" the Government's argument that records related to her cellphone were not admitted at trial. *Def.'s Reply* at 2. She asserts that "the call logs were admitted at the trials to prove she contacted [Frank] Monroe." *Id.* She also says that Government exhibits definitely show Deputy Reardon searching Ms. Swan's cellphone. *Id.* at 3 (citing ECF Nos. 82, 166, 272 at 11-DVD). She argues that other than during the

---

[2] Each case is different. In *Farlow*, as of October 21, 2011, the date of the Order, Mr. Farlow was extremely ill and unlikely to flee or pose a risk to the community if released. *Farlow*, 824 F. Supp. 2d at 193. He passed away while in prison on February 12, 2013. *Letter from Delbert G. Sauers, Warden, Fed. Correctional Complex, Allenwood to Hon. John A. Woodcock, Jr.* (Feb. 15, 2013).

February 3, 2011 interview, law enforcement never had possession of Ms. Swan's cellphone and she concludes that "the search of the call logs on Carole's cell phone, resulting in the discovery of 'relevant evidence' (and other personal information), occurred on February 3, 2011 while the phone was unlawfully in the hands of law enforcement." *Id.* Ms. Swan says that the call log evidence was admitted in both trials to prove "*Carole initiated contact with Monroe*", thereby "quash[ing] any possible defense theory that the extortion was *Monroe's* game." *Id.* at 4 (emphasis in *Def.'s Reply*). She concludes that law enforcement's unwarranted search of her cellphone violated the First Circuit decision of *United States v. Wurie*, 728 F.3d 1 (1st Cir. 2013). *Id.* at 5. She notes that following *United States v. Cameron*, 09-cr-24-JAW (*Order of Court* [ECF No.] 267), the First Circuit ordered Mr. Cameron released pending appeal of his conviction based on intervening constitutional law.[3] *Id.* at 6. Ms. Swan concludes that the holdings in this array of cases are sufficient for this Court to find that she has presented a "close question" on appeal. *Id.* at 6-7.

### D. Government's Sur-reply

In its sur-reply, the Government says that the so-called call logs were in fact audio recordings and transcripts of calls between Ms. Swan and Frank Monroe, that these recordings were made on a recording device that law enforcement gave Mr. Monroe, that the recordings were authenticated at trial by both Detective Bucknam

---

[3]     *Cameron* is not helpful to Ms. Swan. Despite assurances to the contrary, Mr. Cameron immediately fled the District of Maine upon the First Circuit's decision. He was later apprehended in the state of New Mexico and pleaded guilty to criminal contempt for violating multiple conditions of the bail order. *United States v. Cameron*, 1:13-cr-00001-JAW, *Minute Entry* (ECF No. 16) (D. Me. Feb. 19, 2013); *Order on Guidelines Calculation* at 27-46 (ECF No. 28).

and Mr. Monroe, and that the transcripts were authenticated at trial by Mr. Monroe. *Gov't's Sur-reply* at 1-2. It repeats its view that Ms. Swan "has not identified any evidence seized from the defendant's cell phone or admitted into evidence." *Id.* at 2.

## III.  LEGAL STANDARD

This Court has the authority to release an incarcerated defendant pending appeal under 18 U.S.C. § 3143(b)(1). Under that provision, the judicial officer shall order a person found guilty of an offense and sentenced to a term of imprisonment and who has filed an appeal be detained unless the judge finds:

(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under § 3142(b) or (c) of this title; and

(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in--

(i)  reversal, [or]

(ii)  an order for a new trial[.][4]

The burden rests on Ms. Swan. *United States v. Colon Berrios*, 791 F.2d 211, 211 (1st Cir. 1986) (Defendant has "burden of demonstrating by clear and convincing evidence that he is not likely to flee").

The First Circuit interpreted the "raises a substantial question of law or fact" provision in *United States v. Bayko*, 774 F.2d 516 (1st Cir. 1985). Analyzing the

---

[4]      The statute also provides for release when there is a likelihood that the appeal will result in a sentence that does not include a term of imprisonment or a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal. 18 U.S.C. § 3143(b)(1)(B)(iii), (iv). Neither is applicable.

statutory language, the First Circuit adopted the Eleventh Circuit's interpretation and concluded that the phrase should be read to require that the issue appealed be "a 'close' question or one that very well could be decided the other way." *Bayko* at 523 (quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)). The First Circuit expressly rejected any interpretation that would require the district court to conclude that its own ruling would likely be reversed, as that would present the district court with a classic "Catch 22." *Bayko* at 522-23; *see also United States v. Tyler*, 324 F. Supp. 2d 69, 70 (D. Me. 2004).

## IV.   DISCUSSION

### A.   The Trial Transcript and De Novo Review

In her motion, Ms. Swan notes that she objected to the Magistrate Judge's recommended decision and correctly says that "[d]e novo review of her objections is required under 28 U.S.C. § 636(b)(1)(C)." *Def.'s Mot.* at 7. For context, the Magistrate Judge held a suppression hearing on December 5, 2012 and during that suppression hearing, the Government marked and admitted a transcript of the February 3, 2011 Sheriff's Office interview as Government Exhibit 11-T. *Minute Entry* (ECF No. 81); *Court Ex. List* at 1 (ECF No. 82). Three transcripts of this same interview are involved and it is important to distinguish among the three: (1) the suppression transcript, (2) the redacted trial transcript, and (3) the unredacted trial transcript. For clarity the Court refers to the transcript that was introduced during the suppression hearing as the suppression transcript. At trial, the Government first introduced into evidence a redacted transcript of this interview, which the Court

refs to as the redacted transcript. Finally, later at trial, the Government referred to an unredacted transcript of this same interview, which the Court refers to as trial transcript.

On January 11, 2013, Ms. Swan objected to the Recommended Decision of the Magistrate Judge. *Def. Carole Swan's Objection to the Recommended Decision Regarding Her Mot. to Suppress Statements* (ECF No. 98). The suppression transcript and videotape of the February 3, 2011 interview, along with other exhibits and a transcript of the proceedings, became the record for purposes of de novo review. *Tr. of Proceedings* at 3 (ECF No. 90). Ms. Swan correctly observes that this Court "was required to give fresh consideration to the material facts", citing *United States v. Raddatz*, 447 U.S. 667, 669 (1980), and she states that "'[f]resh consideration' includes viewing the videotape and reading the entire transcript of the questioning and the transcript of the motion to suppress hearing." *Id.* at 7-8. In its February 25, 2013 Order affirming the Magistrate Judge's Recommended Decision on the motion to suppress, this Court affirmed that it had "reviewed and considered the Magistrate Judge's Recommended Decision together with the entire record." *Order Affirming the Recommended Decision of the Magistrate Judge on Mot. to Suppress* at 1 (ECF No. 104) (*Order Affirming Recommended Decision*).

In her motion for release pending appeal, however, Ms. Swan cites a portion of the trial transcript as follows: "This Court stated at a side bar during the July trial that it had not read the entire transcript of the audio portion of the interview." *Id.* at 4 n.1. (citing ECF No. 184 at 117). Although she does not come right out and say

it, Ms. Swan implies that the Court failed to do its duty when it performed a de novo review of the Magistrate Judge's recommended decision by failing to review the transcript of the interview, that its assertion that it had reviewed the entire record was erroneous, and that it revealed as much during the trial sidebar when it confessed that it had not read the transcript of the sheriffs' interview of Ms. Swan. This is a very serious charge to make against a judge, even or especially by inference. It is not true.

Ms. Swan misquotes and badly takes out of context the Court's comment at sidebar. During trial, the Court had admitted a redacted video and redacted transcript of portions of the February 3, 2011 Sheriff's Office interview into evidence as Exhibits 11A and 11A-T on July 18, 2011 through the testimony of David Bucknam, one of the interviewing deputies. *Partial Tr. of Proceedings* at 25:19-26:10 (ECF No. 90). This redacted version of the interview was played to the jury on July 18, 2013 and a redacted transcript of the interview was provided to the jury to allow them to follow the audio of the DVD. *Test. Of David A. Bucknam.* at 22:21-23 (ECF No. 188). As the disk was being played, the Court read the redacted transcript along with members of the jury and counsel. The Court's sidebar comment about not having seen the transcript did not relate to this redacted transcript, which was already in evidence and which the Court had read along with the jury and counsel as the DVD was being played.

During a colloquy concerning the admission of the redacted disk and the redacted transcript, the prosecutor referred to a complete transcript of the interview

as Government Exhibit 11.  *Id.* at 21:23-22:1 ("Just to be clear, 11 is the whole interview.  11A is just a portion of the interview, and 11A-T is the transcript of a portion, and I have just offered the portion").  Thus, there was a separate unredacted disk and trial transcript that had not been admitted, which as the Court has noted, it refers to as the trial transcript.

The sidebar took place six days later during the prosecutor's cross-examination of Ms. Swan.  During cross-examination, the prosecutor asked Ms. Swan questions about what she had told the deputies at the Sheriff's Office during the February 3, 2011 interview.  At one point, he approached her and asked:

> Q.  Don't you remember, he said, does your husband beat you and you said, yes?"
>
> A.  I think that's backwards, Mr. Clark.

*Test. of Carole Swan* at 115:18-20 (ECF No. 184) (*Swan Tr.*).  Apparently believing that she was contradicting what she had told the deputies during the February 3, 2011 interview, the prosecutor showed Ms. Swan a complete (unredacted) copy of the trial transcript:  "I'm going to show you what's - - I've marked as Government Exhibit 11-T, which is the full transcript of that interview.  You've seen this before, haven't you, Ms. Swan?"  *Id.* at 115:25-116:2.  Ms. Swan responded, "yes."  *Id.* at 116:3.  The prosecutor began to ask Ms. Swan to review Government Exhibit 11-T, which again at that point had not been admitted into evidence.  *Id.* at 115:25-116:10.  This drew an objection from defense counsel:

> I think if we're going to introduce portions of the transcript that weren't introduced in evidence, we have a problem with that, I think, because

then you get into the completeness doctrine, and there's other information in there that can't be introduced.

*Id.* at 116:20-24.

At sidebar, the prosecutor stated that he intended to move to introduce the trial transcript, namely the entire unredacted transcript of the Sheriff's Office interview as Government's 11-T. *Id.* at 116:25-117:4. Defense counsel objected on the ground that there were a "multitude" of "evidentiary problems with admitting the whole transcript" and he said that that was why the admitted, redacted exhibit, *Gov't's* 11A and 11A-T, had been "parsed down like that." *Id.* 117:5-8. The prosecutor disagreed, stating that the trial transcript of the interview had been "parsed down for the efficiency of the government in present - - presenting its case. The whole exhibit is her statements." *Id.* at 117:9-11. Although the parties were arguing about the unredacted trial transcript, marked as Government 11-T, the Court did not physically have and had not seen the entire unredacted trial transcript; at that point, it was a marked, not admitted exhibit in the hands of counsel, not the Court. Without the physical transcript, the Court could not evaluate the arguments of counsel about the admissibility of the unredacted trial transcript.

Instead of resolving the admissibility of the entire trial transcript, the Court focused on whether the portion of the trial transcript that had precipitated the objection was truly objectionable. To make this determination, the Court had to review that portion of the unredacted trial transcript dealing with what Ms. Swan told the police about her husband beating her. But again, the Court did not physically have and had not seen the unredacted trial transcript, Government's 11-T, so it told

13

counsel: "I don't know what you are talking about. I haven't seen the whole transcript." *Id.* 117:13-14.

It would seem obvious, but the Court was not saying that it had never read the suppression transcript that had been admitted during the December 5, 2012 suppression hearing. In fact, in reviewing the recommended decision, the Court had analyzed the disk and followed along the entire interview of Ms. Swan. Instead, the Court was signaling to counsel that it could not rule on whether the questions on cross-examination were susceptible to a completeness objection because the Court did not physically have and had not seen the full trial transcript of the Government's exhibit 11-T that the parties were arguing about.

To resolve the immediate dispute, the Court asked defense counsel whether the prosecutor's question to Ms. Swan about whether she told the deputies that her husband beat her would be inadmissible. *Id.* at 118:7-13. Defense counsel acknowledged it would not. *Id.* at 118:14. The Court then asked defense counsel whether there was any other problem with the trial transcript that would make the portion applicable to the questions being asked Ms. Swan inadmissible under the rule of completeness.[5] Defense counsel responded, "No." *Id.* at 118:15-17. The Court allowed the prosecutor to refresh Ms. Swan's recollection with that portion of the trial transcript. *Id.* at 119:3-120:11. Although the Court does not recall the specifics, the Court Exhibit List indicates that both Government Exhibits 11 and 11-T were

---

[5] This at least is how the Court interprets this statement, which seems a bit garbled, maybe accurately, in the transcript. *Id.* at 118:15-19.

reoffered and admitted without objection on July 26, 2013.  *Ex. List* at 2 (ECF No. 166).

To reiterate, in its sidebar discussion with counsel, the Court was referring to the trial transcript, not the suppression transcript.  For all the Court knew at that point, the trial transcript in the hands of the prosecutor was different from the suppression transcript admitted during the December 5, 2012 suppression hearing.  It later turned out that the suppression transcript and the trial transcript were the same, but the Court did not know that at the time.  Moreover, when it reviewed the suppression transcript in February 2013, the Court did not commit it to memory.  Even if it had known that the suppression transcript and the trial transcript were identical, it still would have asked the lawyers to hand over the trial transcript so that it could rule on the completeness objection that defense counsel had posited.

In sum, in its colloquy with counsel during the July trial, the Court was not confessing that, contrary to the statement in its Order affirming the Recommended Decision, it had actually not done its job when it reviewed the Magistrate Judge's Recommended Decision in January and February 2013.  The Court takes deeply seriously its statutory and procedural obligations to perform a de novo review of recommended decisions in motions to suppress under 28 U.S.C. § 636(b)(1)(c) and Federal Rule of Criminal Procedure 59(b)(3) and it performed that obligation in this case by carefully reviewing not only the transcript of the suppression hearing and all the exhibits, including the admitted suppression transcript, but also the Defendant's objection and the Government's response to those objections.

Simply put, the Defendant's implied charge against this Court is false. Like some sidebar disputes, this tempest passed and the trial moved forward, only now to be mangled into an inferential charge against the integrity of this Judge, which the Court emphatically rejects. The Court concludes that this assertion is frivolous and does not provide a basis for release on appeal.

## B.   Substantial Question of Law or Fact

### 1.   The February 3, 2011 Interview

The heart of Ms. Swan's motion is her contention that the Court erred in refusing to suppress her February 3, 2011 statements to the deputy sheriffs at the Sheriff's Office. The Court carefully re-reviewed the Recommended Decision in this case and concludes that Ms. Swan has failed to raise a "substantial question of law or fact" justifying her release. 18 U.S.C. § 3143(b)(1)(B).

### a.   Objective or Subjective Standard

Ms. Swan's first claim of error is that the Magistrate Judge improperly applied a subjective, not an objective standard in evaluating whether Ms. Swan was placed in custody and whether her statements were voluntary. *Def.'s Mot.* at 11 ("The author erred by employing a subjective standard"). Ms. Swan states that "[c]ustody is determined by ascertaining what a reasonable person would do if faced with the same circumstances." *Def.'s Mot.* at 5. Later, Ms. Swan cites *Stansbury v. California*, 511 U.S. 318, 323 (1994) as setting forth the correct standard. *Id.* at 10.

However, in the Recommended Decision, the Magistrate Judge describes "two objective tests" that she applied to the motion to suppress. In describing the

appropriate standards, the Magistrate Judge cites *Stansbury*, the case that Ms. Swan says contains the correct objective standard. *Recommended Decision* at 7-8. The Magistrate Judge went on to write that the first objective test is whether a reasonable person in the circumstances would have felt "at liberty to terminate the interrogation and leave." *Id.* (*quoting Thompson v. Keohane*, 516 U.S. 99, 116 (1995)). The second objective test, wrote the Magistrate Judge, is "whether those circumstances would have been likely to coerce a suspect to engage in back and forth with the police, as in the paradigm example of traditional questioning." *Id.* at 8 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 436-37 (1984)).

In her motion, Ms. Swan agrees with the Magistrate Judge that an objective standard was proper for determining whether Ms. Swan was in custody. *Def.'s Mot.* at 10. To the extent that Ms. Swan is claiming that the Magistrate Judge applied a subjective, not an objective standard, this simply is in error. To the contrary, the Magistrate Judge repeatedly throughout the opinion explained her analysis based on what "[a] reasonable person in Swan's position" would have understood. *See Recommended Decision* at 9-11. From this, the Court concludes that the Magistrate Judge knew and applied the correct legal standard.

Ms. Swan's argument is really that the Magistrate Judge applied the right standard in the wrong way. She contends that the Magistrate Judge based her Recommended Decision on Ms. Swan's "calm demeanor" and from this, she concludes that the Magistrate Judge, although saying she was applying an objective standard, actually applied a subjective one. *Id.* at 10-11. Ms. Swan argues that "[t]here is no

requirement that a reasonable person exhibit hysteria for a court to find that person was in custody." *Id.* at 11.

First, Ms. Swan focuses on only one part of the Magistrate Judge's considered analysis. Under Supreme Court and First Circuit authority, to determine whether a person is in custody, a court is required to examine "all of the circumstances surrounding the interrogation." *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012) (quoting *Stansbury*, 511 U.S. at 322); *see United States v. Campbell*, 741 F.3d 251, 266 (1st Cir. 2013) ("where the totality of the circumstances shows that a reasonable person would understand that he was being held to the degree associated with a formal arrest") (internal punctuation omitted). In *Howes*, the Supreme Court listed a number of relevant factors, including the suspect's "freedom of movement", the "location [and duration] of the questioning", "statements made during the interview", "the presence or absence of physical restraints", and "the release of the interviewee at the end of the questioning." *Howes*, 132 S. Ct. at 1189. In *Hughes*, the First Circuit added "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *United States v. Infante*, 701 F.3d 386, 396 (1st Cir. 2012) (quoting *United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011)).

In her Recommended Decision, addressing whether a reasonable person in Ms. Swan's situation would have believed that she was in custody, the Magistrate Judge carefully reviewed "the totality of the circumstances," mentioning such factors as (1)

that the deputies did not make a show of force in the parking lot; (2) that the deputies did not order her to talk with them; (3) that Lieutenant Reardon demanded "his money back"; (4) that Ms. Swan went willingly to the Sheriff's Department; (5) that she was not formally placed under arrest; (5) that the deputies took her cellphone from her at the outset of the interview; (6) the interview room was not coercive; (7) that the questioning was not such that would cause a reasonable person to believe that she was under arrest; and (8) that the deputies did not impose any physical restraints on Ms. Swan. *Recommended Decision* at 9-11. As Ms. Swan points out, not all of these factors were in favor of the Government; however, the Magistrate Judge properly determined that in light of "the totality of the circumstances", a reasonable person in Ms. Swan's position would not have believed she was under arrest and would make statements voluntarily.

Ms. Swan objects to the Magistrate Judge's finding that she was "calm and resigned" during the videotaped interview. *Def.'s Mot.* at 10-11. She contends that the Magistrate Judge inappropriately considered her subjective state of mind. *Id.* at 10-11. Ms. Swan is correct that the determination of custody is not "the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323.

But, in evaluating these issues, the law does not require that a court ignore the suspect's personal characteristics. To the contrary, in *Arizona v. Fulminante*, 499 U.S. 279 (1991), the Supreme Court observed that such individual factors as a person's low intelligence, lack of education, and whether he adapted well to stress,

are "relevant in determining whether a defendant's will has been overborne." *Id.* at 286 n.2. More recently, the First Circuit elaborated:

> The majority of the defendant's personal characteristics likewise support the district court's finding of voluntariness. The defendant was mature but not elderly. He had a high school education and had taken some college courses. There is no indication that he suffered from low intelligence. Finally, he had a respectable employment history, most recently as a self-employed contractor and part-time lobsterman.

*Hughes*, 640 F.3d at 438.

Nor does the law require a court to ignore a suspect's apparent response to the circumstances surrounding his police interview. In *Infante*, for example, the First Circuit observed that "[t]he atmosphere was non-confrontational" and "[the defendant] even shared jokes with the officers" and was "coherent and responsive, showing no sign of mental impairment." *Infante*, 701 F.3d at 397.

Thus, a court may consider a defendant's individual circumstances in evaluating whether a reasonable person in her position would believe she was in custody and whether her statements were voluntary. *United States v. Jacques*, 744 F.3d 804, 809 (1st Cir. 2014) ("A defendant's calm demeanor and the lucidity of his statements weigh in favor of finding his confession voluntary"). However, here the Magistrate Judge considered this factor along with a host of other factors in making these determinations. *Infante*, 701 F.3d at 437 ("Where the signals are mixed, the district court's choice between competing inferences cannot be clearly erroneous").

### b. The Initial Encounter and Money Demand

Ms. Swan's second complaint involves the Magistrate Judge's conclusions regarding Ms. Swan's initial encounter with the deputies and Deputy Reardon's

demand: "I want my money back."  *Def.'s Mot.* at 8-9.  In the Magistrate Judge's

Recommended Decision, she described the deputies' first encounter with Ms. Swan:

> After parking in the laundry's lot, Swan exited her vehicle, closed her
> door, and proceeded toward the laundry.  At roughly the same time, the
> deputies parked their vehicle behind and slightly to the side of Swan's
> vehicle.  More likely than not, the placement of their vehicle and the
> presence of snow banks would have prevented Swan from backing out of
> the parking lot, but she was presently walking toward the laundry.  The
> deputies stepped out of their vehicle and approached Monroe[6] (sic) when
> she was about half way to the laundry and within several paces of her
> vehicle.  Lieutenant Reardon called out "Carol" and Swan turned to face
> the deputies as they approached.  They stopped roughly six feet from
> Swan and Lieutenant Reardon stated, "I want my money back."
>
> Swan quickly appreciated that the men approaching her were police
> officers because Lieutenant Reardon displayed a badge.  In response to
> Reardon's request to get the money back, Swan volunteered that she
> was owed money from Frank Monroe.  Reardon repeated that he wanted
> his money back.  Swan walked a few paces back to her vehicle and
> retrieved the package and handed it to Reardon.  She then asked, "Am
> I in trouble?"  Reardon said that the parking lot was not the best place
> to discuss the matter and suggested that they talk at the sheriff's office.
> Swan expressed her willingness to do so, probably saying "okay," or
> words to that effect.

*Recommended Decision* at 2-3.  The Magistrate Judge rejected Ms. Swan's testimony

that the deputies crowded her or trapped her between themselves and the open door

of her vehicle.  *Id.* at 3 n.1.

> As regards the money demand itself, the Magistrate Judge wrote:
>
> The only directive that Swan received during this initial encounter was
> the indication from Lieutenant Reardon that he "wanted his money
> back."  A reasonable person would have understood that in this one
> respect Reardon would not accept no for an answer.  But this one
> directive does not beget a custodial situation.

*Id.* at 9.

---

[6]     This must be a typographical error; the deputies were approaching Ms. Swan.

Ms. Swan assails this part of the Recommended Decision as "a distortion of Reardon's testimony [that] ignores the aggressive stance that Reardon displayed." *Def.'s Mot.* at 8. She criticizes the Magistrate Judge for "[t]his downplaying of crucial testimony," leading to the "unsupported finding that the officers did not use intimidation or coercion during the initial encounter." *Id.* at 9. She emphasizes that "[a]n objectively reasonable person confronted by an armed law enforcement officer who was <u>demanding 'his money</u>,'" and with his or her vehicle blocked in such a way that prevented egress, would not have felt free to ignore the officers and leave their vehicle and cell phone with the officers." *Id.* (emphasis in original).

Contrary to Ms. Swan's contentions, the Magistrate Judge did not distort Lieutenant Reardon's testimony nor ignore his supposedly aggressive stance. Instead, the Magistrate Judge found that based on Lieutenant Reardon's forceful and repeated demand, a reasonable person would have known that he "would not accept no for an answer." *Recommended Decision* at 9. Balancing all of the evidence, the Magistrate Judge concluded that simply because Ms. Swan must have known that she had to turn the money back over to Lieutenant Reardon, the encounter was not transformed into an arrest. *Id.* Furthermore, the Magistrate Judge noted that "neither deputy drew his sidearm, threatened Swan, or used hard language during this encounter." *Id.* at 4. According to the Magistrate Judge, Ms. Swan asked the deputies whether she was in trouble. *Id.* at 3. Lieutenant Reardon said that the parking lot was not the best place to discuss this matter, suggested they go to the Sheriff's Office, and she agreed. *Id.*

From this Court's perspective, there is a contrast between this parking lot encounter and many, though not all, arrests. The deputies did not yell out commands, they did not draw their sidearms, they did not order Ms. Swan to the ground, they did not frisk her, they did not place her in handcuffs, they did not tell her she was under arrest, they allowed her to retrieve the money from her vehicle, and they suggested, but did not demand that they continue their discussion at the Sheriff's Office. Even though some evidence suggests that the February 3, 2011 interview was a custodial interrogation, there is other evidence that strongly suggests otherwise. To disagree with Ms. Swan's view is not to distort the balance of the evidence. Ms. Swan has not persuaded this Court that its shared view with the Magistrate Judge of the evidence at the suppression hearing was clearly erroneous.

### c.    The Cellphone

In her motion, Ms. Swan stresses that she was "deprived of the use of her cellphone" and further states that Detective Bucknam "also made sure Carole could not call anyone for advice by taking possession of her cell phone and later declining to return it to her when she asked for it."[7] *Def.'s Mot.* at 11, 13. The videotape of the interview shows Detective Bucknam with a cellphone. At the beginning of the interview, the issue of her cellphone comes up:

| Carole Swan: | That, can I have my cell phone back? |
|---|---|
| Bucknam: | Yeah, we'll get that back to you soon. Okay? |
| Carole Swan: | Okay. |
| Bucknam: | I'm not gonna be keeping it. Um, I just don't want you to get distracted. |

---

[7]    The Magistrate Judge did not credit Ms. Swan's testimony that the deputies abruptly grabbed her cellphone. *Recommended Decision* at 4. She found instead that Detective Bucknam took possession of the cellphone before entering her vehicle. *Id.*

| Carole Swan: | No (unintelligible). |
|---|---|
| Bucknam: | Okay? |
| Carole Swan: | (Unintelligible). |

*Gov't's Ex.* 11-T at 3.[8]  At one point, Ms. Swan's cellphone rings and she says "(unintelligible) that's my husband (unintelligible)." *Id.* at 17.  Detective Bucknam says, "Nope (unintelligible).  I'm just gonna hit the thing, okay?"  Ms. Swan replies, "All right".  Detective Bucknam continues, "goes over to voicemail."  Ms. Swan says, "Yeah."  *Id.*  Roughly two-thirds of the way through the interview, when the topic turns to her husband, Ms. Swan mentions that she "just need[s] to call my husband" saying that he is "very controlling."  *Id.* at 68.  The deputies hand over her cellphone and she calls her husband, telling him "I'm not under arrest."  *Id.* at 70.

Ms. Swan's current version of this interview is inconsistent with the evidence. Although she claims that the deputies deprived her of the use of her cellphone, she was in fact allowed to call her husband during the interview, and during that conversation, she expressly told him that she was not under arrest.  There is no basis to find on this record that if she had asked to contact a lawyer (which she did not do), the deputies would have refused her request.

### d.     Psychological Custody

Although Ms. Swan was never physically restrained, she correctly states that psychological pressures may be restraints.  *Def.'s Mot.* at 9 (citing *United States v. Rogers*, 659 F.3d 74, 77 (1st Cir. 2011)).[9]  But the Magistrate Judge cited *Rogers* and

---

[8]      The Court re-reviewed the DVD to see if it could understand the portions of this exchange marked "unintelligible."  It could not.  In any event, the comments are very brief, perhaps one word.

[9]      Although Ms. Swan correctly observes that the "First Circuit in *United States v. Rogers*, 659 F.3d 74, 77 (1st Cir. 2011) suppressed the defendant's statements to law enforcement made while

explicitly stated that "[c]ustody may arise when the suspect is otherwise deprived of his freedom of action in any significant way, including through the imposition of psychological pressures." *Recommended Decision* at 7 (citing *Rogers*, 659 F.3d at 77).

In *Rogers*, the First Circuit emphasized that custodial interrogation has "boiled the enquiry down to two elements: whether a reasonable person in the circumstances would have felt at liberty to terminate the interrogation and leave, and if not, whether those circumstances would have been likely to coerce a suspect to engage in back and forth with the police, as in the paradigm example of traditional questioning." *Rogers*, 659 F.3d at 78 (internal citation omitted).

Here, Ms. Swan was repeatedly told that she was free to leave. At the outset of the interview, Lieutenant Reardon states: "You are not under arrest" and "[a]t any point you want to get up and walk out of here, that's fine. You just came in through the exit and all you gotta do is open it up." *Gov't's Ex.* 11-T at 1. "Again, you're not under arrest. All you gotta is open this door and walk out." *Id.* at 2. During the interview, Lieutenant Reardon states: "No, this last one ain't Frank's idea. Okay? So if, if you're gonna bullshit, get up and walk out. Okay?" *Id.* at 16. Around two-thirds of the way through the interview, Ms. Swan talks to her husband on her cellphone and says: "Hi! Where are you? Because I'm at the Sheriff's Department. They say I'm not under arrest but, um, I'm in a mess to do with town stuff. So I will talk to

---

inside and outside his home, a place where he felt comfortable", *Def.'s Mot.* at 13, the First Circuit stressed that the defendant "was not advised that he was free to have nothing to do with the enquiring police officers while they were there" and stated that "the most significant element in analyzing the situation is that the military had made certain that Rogers did not walk into it voluntarily, or confront the police with free choice to be where he was." *Rogers*, 659 F.3d at 78. Mr. Rogers, the First Circuit noted, was "under a military order to be there at the time." *Id.* There are no such circumstances here.

you about it when I see you." *Id.* at 70. She then says, "I'll talk to you in a while." *Id.* Toward the end of the interview, Lieutenant Reardon mentions: "[K]nowing you just sat here and didn't get up and walk out, because you could have at any point." *Id.* at 80. At the end of the interview, Ms. Swan left the Sheriff's Office and was not arrested. *Id.* at 87-90.

Although it is true that psychological restraint may amount to custody, the Court disagrees with Ms. Swan that she was under such psychological restraint in this situation. *See Jacques*, 744 F.3d at 810 ("[T]he mere fact that a defendant is placed 'under some psychological pressure' by agents does not necessarily render a confession involuntary").

### e.    Specific Questioning

In her motion, Ms. Swan criticizes the Recommended Decision as "devoid of an analysis of the incriminating nature of the questions put to Carole." *Def.'s Mot.* at 16. She maintains that the deputies' questions "violated the holding in *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)." *Id.* It is true that the deputies asked Ms. Swan very specific questions about her extortion of Frank Monroe. The Magistrate Judge touched on this issue in her Recommended Decision, noting that the "facts in this case do not divulge any coercive police activity, which undermines Swan's contention that her statements were not voluntarily given." *Recommended Decision* at 11. The Magistrate Judge also commented that "Swan does not brief the voluntariness issue in detail, leaving the court to decide which aspects of the interview Swan might consider most coercive." *Id.* at 11, n.4. The Magistrate Judge assumed that Ms. Swan

was "referring to statements related to the future consequences of her acts and her cooperation" and quoted a recent district court case in which similar statements by the police were found not to render the suspect's statements involuntary. *Id.* (quoting *United States v. Genao*, 2:12-cr-00090-NT, 2012 U.S. Dist. LEXIS 170941, at *15-16 (D. Me. Dec. 3, 2012)). Ms. Swan bears an especially heavy burden to demonstrate that issues she did not adequately brief before the trial court amount to legal error on appeal.

In *Jacques*, the First Circuit recently reiterated that the determination of voluntariness includes "both the nature of the police activity and the defendant's situation" and involve factors such as "the length and nature of the questioning, promises or threats made by the investigators, and any deprivation of the suspect's essential needs. They also include the defendant's personal circumstances, including his age, education, intelligence, and mention condition as well as his prior experience with the criminal justice system." *Jacques*, 744 F.3d at 809 (internal citations omitted). Thus, in *Jacques*, the First Circuit upheld the district court's determination that the defendant's waiver was knowing, intelligent and voluntary when the defendant confessed after six hours of interrogation at Massachusetts State Police offices during which the officers made threats of retaliation, preyed upon family feeling, and exaggerated the strength of the evidence against the defendant. *Id.* at 809-812. The deputies' interview of Ms. Swan was a pale shadow of what the First Circuit described and upheld in *Jacques*.

### 2.    *Riley*

The Magistrate Judge issued the Recommended Decision on the motion to suppress on December 12, 2012 and this Court affirmed it on February 25, 2013. *Recommended Decision*; *Order Affirming Recommended Decision*.   The Supreme Court decided *Riley* on April 29, 2014.  *Riley*, 134 S. Ct. at 2473.  The parties assume that *Riley* applies to cellphone searches conducted before its issuance.  It may not. *See Davis v. United States*, 131 S. Ct. 2419, 2429 (2011) ("An officer who conducts a search in reliance on binding appellate precedent does no more than 'act as a reasonable officer under the circumstances.'" (quoting *United States v. Leon*, 468 U.S. 897,920 (1984))).[10]  Nevertheless, for purposes of this motion, the Court assumes *Riley* could apply.

The parties have sparred over whether law enforcement searched Ms. Swan's cellphone on February 3, 2011 and whether the Government introduced the results of that search at Ms. Swan's trials.  In her motion, Ms. Swan claims that "[t]he data and/or call log obtained via the illegal search of the cell phone during the questioning was admitted into evidence."  *Def.'s Mot.* at 20.  She cites "Dkt. #'s 166, 272, Exhibit 11."  Exhibit 11 is the DVD of the entire February 3, 2011 Sheriff's Office interview. In its response, the Government says that "[t]here was no search of her cell phone on February 3, 2011."  *Gov't's Opp'n* at 7.  In her reply, Ms. Swan argues that "it is the

---

[10]     Ms. Swan cites *United States v. Wurie*, 728 F.3d 1, 6 (1st Cir. 2013) for the proposition that "the search of a cell phone's data and/or call logs absent a warrant is not subject to 'ifs, ands, and buts.' Rather, the First Circuit crafted a bright line rule for law enforcement to follow."  *Def.'s Reply* at 5. This Court agrees that in *Wurie*, the First Circuit anticipated *Riley*.  But the First Circuit decided *Wurie* on May 17, 2013, well after the February 3, 2011 interview of Ms. Swan.

government's exhibit that definitively shows Reardon searching the cell phone" and she cites docket numbers "82, 166, and 272 at 11-DVD." *Def.'s Reply* at 3.[11]

Ms. Swan's generalized reference does not meet her burden. The DVD of her February 3, 2011 interview is over ninety minutes long, and the Court re-examined the transcript of that interview and re-viewed the video. Despite Ms. Swan's assertion, nowhere did the Court observe "Reardon searching the cell phone."[12] *Def.'s Reply* at 3. To state the obvious, the DVD of the Sheriff's Office interview is not a call log.

The Court reviewed the exhibit lists for both trials and there is no indication that the Government introduced Ms. Swan's cellphone call log into evidence. In her reply, Ms. Swan clarifies that "the call logs were admitted to prove Carole contacted Monroe." *Def.'s Reply* at 4 (citing "Dkt. #'[s] 166 at 1-1A-010, 272 at 1A-10"). She goes on to say that "[t]he government did not argue that exhibits numbered 1 through 1A-10 were obtained from another source." *Id.* In its sur-reply, the Government pointed out that these exhibits were not call logs from Ms. Swan's cellphone; they were the audio recordings and transcripts of ten calls between Frank Monroe and Carole Swan that took place between January 31, 2011 and February 3, 2011. *Gov't's*

---

[11]     Two of the three docket entries she cites, Nos. 166 and 272, contain extensive exhibit lists and it is not clear whether Ms. Swan is citing the DVD exclusively or a broader list of exhibits. The Court assumes that because she references "the government's exhibit" she is only citing the DVD of the deputies' February 3, 2011 interview with Ms. Swan.

[12]     If Ms. Swan still believes the video shows Deputy Reardon searching her cellphone and wishes to bring this to the attention of the Court, she is free to file a motion for reconsideration. But she should be specific as to when during this interview she believes it shows Deputy Reardon searching the cellphone by referencing the conversation that took place at the time she says the search took place. She cannot simply refer the Court to the entire DVD and tell the Court to go find it.

*Sur-reply* at 1-2.  The Court has reviewed Government Exhibits 1 through 1A-10 and concludes that the Government, not Ms. Swan, is correct.

The Court concludes that there is no evidence that the Government searched Ms. Swan's cellphone or that her cellphone log was ever admitted into evidence at either of her trials.  *Riley* does not apply.  Ms. Swan has not demonstrated that *Riley* raises a substantial question of law or fact for purposes of her pending appeal.

## V.    CONCLUSION

The Court DENIES the Appellant's Emergency Motion for Release Pending Appeal Pursuant to FRAP Local Rule 9(b), 18 USC 3143(b), and 3145(c), and *Riley v. California*, 134 S. Ct. 2473 (June 2014) (ECF No. 386) because the Defendant has failed to demonstrate that her appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in reversal or an order for new trial.[13]

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 22nd day of October, 2014

---

[13]    Although the Court agrees that Ms. Swan is not likely to flee, it does not reach whether she has demonstrated by clear and convincing evidence that she does not pose a danger to any other person or the community if released.  18 U.S.C. § 3143(b)(1)(A).