## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:12-cr-00027-JAW-01 |
| | ) | |
| CAROLE SWAN | ) | |

## ORDER DENYING MOTION TO EXPAND RECORD AND MOTION FOR RECONSIDERATION

The Court denies Carole Swan's motion to expand the record and motion for reconsideration of its order denying her emergency motion for bail pending appeal. Although Ms. Swan directed the Court to where in a videotaped interview one of the deputy sheriffs searched her cellphone, she has failed to convince the Court that the results of the cellphone search were admitted at either of her jury trials. Next, Ms. Swan asks the Court to expand the record on appeal to include an enhanced transcript of an investigative interview that was videotaped and played to the juries that convicted her. The Court rejects her request because the record must contain the evidence the juries actually heard, not the evidence they could only have heard with enhanced listening techniques. Finally, Ms. Swan raises a number of other points, but the Court rejects them as factually erroneous, unsupported by the record, or too insubstantial to present a close question on appeal.

## I.     BACKGROUND

On October 22, 2014, the Court issued a thirty-page order, denying Carole Swan's emergency motion for release pending appeal. *Appellant's Emergency Mot.*

*for Release Pending Appeal Pursuant to FRAP Local Rule 9(b), 18 U.S.C. [§] 3142(b) and [§] 3145(c) and* Riley v. California*, 134 S. Ct. 2473 (June 2014)* (ECF No. 386); *Order Denying Emergency Mot. for Release Pending Appeal* (ECF No. 392). That was Ms. Swan's second motion for release. *See Expedited Mot. for Bail Pending Appeal* (ECF No. 373); *Order Denying Mot. for Release Pending Appeal* (ECF No. 376) (*Order*). On October 24, 2014, Ms. Swan filed two more motions: (1) a motion to expand the record; and (2) a motion for reconsideration. *Appellant's Mot. to Expand Record* (ECF No. 394) (*Record Mot.*); *Appellant's Mot. for Recons. of this Ct.'s Finding that the Cell Phone Was Not Searched* (ECF No. 395) (*Recons. Mot.*). She filed an errata notice on October 25, 2014. *Errata Notice Re: Appellant's Mot. for Recons.* (ECF No. 396). On October 29, 2014, the Government objected to both motions. *Gov't's Resp. in Opp'n to Def.'s Mots. to Expand Record and for Recons.* (ECF No. 397) (*Gov't's Opp'n*). On November 6, 2014, Ms. Swan filed her reply to the Government's response. *Appellant's Reply to the Gov't's Opp'n to Mot. to Expand Record and Mot. for Recons.* (ECF No. 398) (*Def.'s Reply*).

## II.    THE PARTIES' POSITIONS

### A.    Carole Swan's Motions

Ms. Swan asks the Court to include in the record a copy of a newly-produced, enhanced transcript of Lieutenant Reardon and Detective Bucknam's February 3, 2011 Sheriff Office interview of Ms. Swan. *Record Mot.* at 1. She says that the transcript, provided by transcription and court reporting firm Brown & Myers, "provides clarity to critical 'unintelligible or UI' parts of the government's three

transcripts: the suppression hearing transcript, the redacted transcript and the unredacted transcript." *Id.* Ms. Swan explains the genesis of the Brown & Meyers transcript. *Recons. Mot.* at 1-2. She says she hired Brown & Meyers "to enhance and transcribe the audio portion of the videotape." *Id.* She contends that the some of the statements on the DVD deemed unintelligible were in fact capable of being discerned. *Id.* at 2. She concedes that the clarified statements "are important to the denial of the motion to suppress", but claims they are "not dispositive to the search of the cell phone." *Id.*

Turning to the motion to suppress, Ms. Swan's motion for reconsideration points the Court to a specific point in the DVD of the February 3, 2011 interview where she says the cellphone was searched. *Id.* at 4-5. She claims that the Brown & Meyers transcript "clearly supports the claim that Reardon did search the call logs on Ms. Swan's cell phone." *Id.* at 4. She further maintains that the enhanced transcript reveals that during the interview, Lieutenant Reardon instructed Ms. Swan that some "[m]ay . . . think of this as a confession, OK?" *Id.* at 5-6. This statement, she says, should have triggered *Miranda*[1] warnings. *Id.*

## B.    The Government's Opposition

In its response, the Government points out that on March 20, 2012, it produced to Ms. Swan through counsel a DVD of the February 3, 2011 interview and a draft transcript of the interview. *Gov't's Opp'n* at 1. The Government also says that redacted and unredacted DVDs and transcripts were admitted into evidence at both

---

[1]    *Miranda v. Arizona*, 384 U.S. 436 (1966).

trials without objection. *Id.* The Government points out that Rule 10 of the Federal Rules of Appellate Procedure provides that the record consists of "(1) the original papers and exhibits filed in the district court; (2) the transcript of proceedings, if any; and (3) a certified copy of the docket entries prepared by the district clerk . . . ." *Id.* at 2-3 (citing FED. R. APP. P. 10(a)). The Government argues that if—as Ms. Swan at times contends—the statements are "clearly audible on the videotape", then the Magistrate Judge and the Court listened to them in deciding the motion to suppress and the juries heard them during the trials. *Id.* at 3. Yet, if—as Ms. Swan elsewhere contends—the statements are audible only when enhanced, then the evidence was never before the district court or the juries and should not be included in the record on appeal. *Id.* Furthermore, the Government contends that the DVDs, not the transcripts, are the evidence, and that the enhanced transcripts have never been properly authenticated. *Id.* at 4. The Government reiterates its view that the motion to suppress was properly denied because Ms. Swan was not in custody and, in any event, evidence from her cellphone was never admitted at trial. *Id.*

### C.    Ms. Swan's Reply

In her reply, Ms. Swan newly contends that this Court should exercise its "power to correct the record" under Federal Rule of Appellate Procedure 10(e)(2)(B). *Def.'s Reply* at 2. In Ms. Swan's view, a revised transcript of the February 11, 2011 interview is essential to a proper evaluation and ruling on her motion for bail, a motion that she says is premised on the denial of her earlier motion to suppress unwarned statements. *Id.* Although she acknowledges that the Court is not obligated

4

to review the accuracy of the transcripts, and that the transcripts were admitted at trial without objection, she maintains that the "omissions and misstatements" she believes Brown & Meyers has uncovered are prejudicial. *Id.* at 3. She restates her earlier argument that the admitted transcripts are inaccurate, asserts that this Court even quoted one of the "misstatements" in its October 22, 2014 Order, and requests that the Court order the Government to "commission the preparation of [a] transcript with enhanced (or far better) equipment and this Court can compare that one to the Brown & Meyers transcript." *Id.* at 2-4. Finally, Ms. Swan provides specific details regarding the search of her cellphone she claims happened during the police interview. *Id.* at 4. She contends that evidence of the search was admitted when two contractors testified for the Government at trial. *Id.* She claims that the contractors' names were sourced from "call logs" from Ms. Swan's phone; Lieutenant Reardon and Detective Bucknam referenced those same call logs, she says, during the February 11, 2011 interview. *Id.*

## III. DISCUSSION

### A. The Record

Federal Rule of Appellate Procedure 10(a) defines what is properly part of the record on appeal. FED. R. APP. P. 10(a). The record is limited to "original papers and exhibits filed in the district court." *Id.* Federal Rule of Appellate Procedure 10(e)(2) permits the record to be corrected or modified "[i]f anything material to either party is omitted or misstated in the record by error or accident. . . ." FED. R. APP. P. 10(e)(2). The purpose of Rule 10(e) has been identified as follows: "to ensure that the court on

appeal has a complete record of the proceedings leading to the ruling appealed from, not to facilitate collateral attacks on the verdict." *Shasteen v. Saver*, 252 F.3d 929, 934 n. 2 (7th Cir. 2001).[2]  The brief answer to Ms. Swan's request to supplement the record is that if the DVDs are intelligible without the enhanced transcript, then the evidence is already part of the record and the record does not need to be supplemented; however, if the DVDs are unintelligible without the enhanced transcript, then the evidence was not part of the record before the district court and must not be included now.

### 1.    The Unenhanced Record

At the suppression hearing, after being authenticated by Detective Bucknam, the DVD and transcript were admitted without objection into evidence.  *Suppression Hr'g Tr.* at 25:19-26:11 (ECF No. 90).  Similarly, at the July 2014 trial, a redacted DVD and redacted transcript were admitted into evidence without objection.  *Partial Tr. of Proceedings* at 20:4-22:3 (ECF No. 188) (*July Trial Tr.*).  Later in the July trial, an unredacted DVD and transcript were admitted into evidence again without objection.  *Ct. Ex. List* at 2 (ECF No. 166).  During the September trial, both redacted and unredacted DVDs and transcripts were authenticated and admitted into evidence without objection.  *Ct. Ex. List* at 2 (ECF No. 272).

During the July trial, the Court instructed the jury that the DVD, not the transcript, controlled:

---

[2] Ms. Swan's reply identifies Rule 10(e)(2)(B) as the rule under which she seeks relief.  *Def.'s Reply* at 2.  To the extent that Ms. Swan has identified "misstatements" in the Government's transcript, however, they are not "material" to the legal analysis in this Order as required by Federal Rule of Appellate Procedure 10(e)(2).

> Ladies and gentlemen, the same rule that I told you about yesterday applies to this. In other words, the transcript is there to help you understand what is being said, but the evidence is not the transcript; it is the recording. And, if there's a difference that you perceive between the recording and the transcript, it is the recording that controls.

*July Trial Tr.* 22:13-19. A transcript of the September trial has not yet been prepared and the Court cannot say for certain that it gave a similar admonition to the September jury, but it is its practice to do so.

Ms. Swan makes two contradictory arguments. The first assumes that critical portions of the DVD that the transcript designated as unintelligible were actually understandable. *Recons. Mot.* at 1 ("The statements that support her claim will not be found in the admitted transcripts, despite those statements being clearly audible on the videotape"); *Id.* at 2 ("Other statements that were deemed unintelligible (UI) in the Government's three transcripts (all three were referenced in this Court's denial of her motion for bail) were in fact capable of being discerned"); *Def.'s Reply* at 1-2 ("Carole has proven that Reardon's question 'Well, do we need this for evidence?' was not unintelligible. . . . Simply viewing and listening to the videotape affirms that Reardon was asking that question while searching the cell phone and that he and Bucknam determined they did not need the physical cell phone because he had call logs"). If it is true that the DVD was intelligible, that the transcript did not accurately reflect what was "clearly audible", and that simply "viewing and listening" will reveal the statements, then there is no need to expand the record because the juries are assumed to have heard and duly considered what is clearly audible on the DVD.

## 2. The Enhanced Record

Ms. Swan's second argument assumes that the DVD is not intelligible unless enhanced. For example, Ms. Swan observes that the Brown & Meyers enhanced transcript clarified statements by Lieutenant Reardon that "were not presented by the Government to this Court nor to the juries." *Recons. Mot.* at 5. She argues that "[t]he actual words spoken in the videotape, captured in the Brown & Meyers transcript, clearly support[] that a 'close question' exists under *Riley v. California*." *Id.* She demands that the Court "commission the preparation of [a] transcript with enhanced (or far better) equipment" and then "compare that one to the Brown & Meyers transcript." *Id.* at 4. But if the DVD is inaudible, then Ms. Swan has not explained why the record should be expanded to include what the juries could not hear and what could not have played a role in their decisions.

### 3. First Circuit Law

The First Circuit has long held that the recording, not the transcript, is the actual evidence. *See Anderson*, 452 F.3d 66, 77 (1st Cir. 2006); *United States v. DeLeon*, 187 F.3d 60, 66 n.3 (1st Cir. 1999). Here, the DVDs were admitted into evidence at contested proceedings and played at both trials and the Court instructed the juries that the recording, not the transcripts, controlled. Indeed, for appellate purposes there is no need to expand the record because "[a]s the actual tapes are a part of the record in the District Court, both the defendant and the appellate court have the ability to listen to those tapes for errors and defects." *United States v. Andiarena*, 823 F.2d 673, 676 (1st Cir. 1987).

One First Circuit case that touches on this issue is *United States v. Anderson*. In *Anderson*, the Defendant questioned whether a testifying agent could properly authenticate a transcript as accurate and the First Circuit "discern[ed] no problem with [the agent] authenticating the transcript." *Anderson*, 452 F.3d at 77. The *Anderson* Court also observed that "if the [defendant] was so concerned about the authenticity of the government's transcript, he could have submitted his own."[3] *Id.* Next, the First Circuit rejected the argument that because the recording was of poor quality, the transcript became the actual evidence. *Id.* The First Circuit noted that the district court had instructed the jury that if the recording—not the transcript— was the actual evidence and if they perceived discrepancies between the recording and the transcript, the recording controlled. *Id.* at 77 ("[T]he district court reminded the jury at least three separate times that the tape, not the transcript, constituted the evidence in this case and that any discrepancies between the two were to be resolved in favor of the tape. In *DeLeon*, we found such a limiting instruction to be an important factor in rejecting the appellant's argument. In this case, we think that such an instruction—especially given the fact that it had been repeated several times by the district judge—ensured that the jury did not rely on the transcript to convict the appellant"). Finally, the *Anderson* Court noted that the government "never attempted to interpret portions of the tape that were unintelligible. Rather, the

---

[3]    The *Anderson* Court observed that the trial court judge invited the party objecting to the transcript to submit his own. *Anderson*, 452 F.3d at 77. Here, the Court did not offer that to Ms. Swan, but there was no reason to do so, because Ms. Swan never objected to the accuracy of the transcripts. *See Recons. Mot.* at 3 ("It is true this Court was not obligated to screen the transcripts for accuracy prior to allowing the Government to admit them at trial, especially when trial counsel raised no objection whatsoever").

transcript specifically noted those portions of the tape that were unclear. Thus, the jury in [*Anderson*] was not able to turn to the transcripts to comprehend the unintelligible portions of the conversation, as the transcript provided no assistance." *Id.* at 78.

This Court views *Anderson* as reiterating four basic principles: (1) a government agent is among those who may authenticate a transcript; (2) if a defendant perceives problems with a transcript, she is free to present her own; (3) a trial court instruction that the recording—not the transcript—controls ensures that the jury will not rely on the transcript if there are discrepancies; and (4) if the transcript does not attempt to interpret the unintelligible, the transcript cannot be said to have misled the jury. Here, *Anderson* clarifies that the procedure followed in Ms. Swan's case was in accordance with First Circuit guidance: (1) the agent authenticated the transcripts; (2) Ms. Swan never objected to the accuracy of the transcripts; (3) the Court instructed the jury that the recording, not the transcript controlled; and (4) the transcript did not misinterpret unintelligible comments, but instead described as unintelligible what Ms. Swan now contends was discernable.

A motion to supplement the record is not a motion for new trial by another name. If Ms. Swan had newly-discovered evidence, she could have, but has not, filed a motion for new trial under Rule 33. FED. R. CRIM. P. 33(b)(1). Of course, Ms. Swan would have to demonstrate this evidence meets Rule 33 criteria. *United States v. Street*, 570 F.2d 1, 2 (1st Cir. 1977) (listing criteria, including that the evidence was newly discovered and that the defendant's failure to discover the evidence was not

due to a lack of diligence). Here, Ms. Swan knew about the unintelligible portions of the DVD long in advance of the trials and sought to obtain an enhanced transcript only after guilty verdicts from two separate jury trials.

It is true that in *Andiarena*, the First Circuit upheld a district court decision to supplement a record on appeal with a transcription of tapes that had been played at trial. *Andiarena,* 823 F.2d at 676-77. In *Andiarena*, however, the transcripts had not been admitted as exhibits, but were the same transcripts that the jury had read while the tapes were being played. *Id.* at 676 ("[T]he government had prepared transcripts of the taped conversations which the witness and counsel followed while the tapes were played"). On appeal, the defendant contended that the district court did not have the jurisdiction to supplement the record with the transcripts that the jury had actually reviewed, a contention the First Circuit rejected as "spurious." *Id.* at 676-77.

Here, recordings and transcripts were admitted into evidence, but neither the Court at the suppression hearing nor the juries at the trials reviewed Ms. Swan's Brown & Meyers enhanced transcript. It is one thing to supplement the record to include a transcript that a jury read but was not admitted; it is entirely different to supplement the record on appeal to include a transcript that neither the Court nor the jury ever read. Typically, the First Circuit takes a dim view of considering evidence on appeal that was not part of the trial record. *See Velazquez-Ortiz v. Vilsack*, 657 F.3d 64, 74 n.10 (1st Cir. 2011) ("This assertion is based on a piece of

evidence that was not submitted to the trial court. The document is not part of the record on appeal and thus we disregard it") (civil case) (internal citations omitted).

Thus, as Ms. Swan has failed to demonstrate that the enhanced transcript fits within Rule 10(a), the Court declines to order that the record be supplemented to include it.[4]

### B.     Misrepresented Statement

Ms. Swan claims that the transcript contains one error of transcription. *Recons. Mot.* at 5. She says that when she asked to have her cellphone back, the transcript says that Detective Bucknam told her that she could have her cellphone back "soon." *Id.* In fact, she says, the enhanced transcript reveals that the Detective said "in just a minute." *Id.* She insists that the two terms—"soon" versus "in a minute"—have materially different meanings because "[t]he length of time is undefined in 'soon'; a minute meant she could have her cell phone back almost now." *Def.'s Reply* at 2. She complains that the "Government does not even touch upon this clear error in its response." *Id.* She maintains that "this Court must address it as the Court quoted this misstatement in its order denying Carole's motion for bail pending appeal." *Id.* at 2-3.

---

[4]     In this Order, the Court has necessarily cited the Brown & Meyers enhanced transcript. By declining to expand the record on appeal to include the Brown & Meyers transcript, the Court is not declining to place the Brown & Meyers transcript in the record to be forwarded to the First Circuit in the event Ms. Swan wishes to appeal this Order. It is, however, declining to expand the record on appeal under Federal Rule of Appellate Procedure 10(a) of what was before the Court and juries leading to the guilty verdicts and sentencing. In fact, in this opinion, the Court has referred to the Brown & Meyers transcript, not necessarily because it is more accurate than the earlier transcripts, but because Ms. Swan has adopted the supposed superior accuracy of the Brown & Meyers transcript.

First, the Court is not at all certain that the DVD, at least in its unenhanced form, confirms that Detective Bucknam said "in just a minute." The Court listened carefully to the unenhanced DVD and heard "soon", not "in just a minute."

Second, even assuming that Detective Bucknam said "in a minute", the Court disagrees that there is a significant difference between the terms. The dictionary provides two definitions for "soon": first, "at once, without delay, and immediately"; and second, "before long, without undue time lapse." WEBSTER'S THIRD NEW INT'L DICTIONARY 2173 (3d ed. 2002). In fact, a synonym for "in a minute" is "soon." In a Minute Synonym, ROGET'S 21ST CENTURY THESAURUS, *http://www.thesaurus.com/browse/in+a+minute* (last visited Nov. 10, 2014). Under the common use of the term, it is not meant literally; the recipient is not invited to get out her stopwatch. In the Court's view, "soon" and "in a minute" are virtually indistinguishable. A "close question" on appeal is not generated by such linguistic subtlety.

Nor is there any record evidence that this distinction is anything but a lawyer's argument. Ms. Swan testified at the suppression hearing and mentioned that one of the law enforcement officers took her phone and placed it on the table where she was seated during the questioning. *Tr. of Proceedings* at 113:11-114:16 (ECF No. 90). But she never asserted the officer's promise to return the cellphone "soon" or "in a minute" or that this promise, by whatever terminology, affected her view of her ability to leave the room. *Id.* at 101:1-129:1.

### C. The Search

In its October 22, 2014 Order denying Ms. Swan's self-described emergency motion for release, the Court stated that it reviewed the DVD of the February 3, 2011 Sheriff's Office interview to see if there was any indication of Deputy Reardon searching Ms. Swan's cellphone as she had alleged. *Order Denying Emergency Mot. for Release Pending Appeal* at 28-29 (ECF No. 392) (*Order on Second Bail Mot.*). In her motion, Ms. Swan failed to be specific as to where, in the extensive interview, she thought Deputy Reardon had searched her cellphone. Accordingly, in a footnote, the Court noted that "if Ms. Swan still believes the video shows Deputy Reardon searching her cellphone and wishes to bring this to the attention of the Court, she is free to file a motion for reconsideration." *Id.* at 29 n.12. The Court noted that if she chose to do so, she could not "simply refer the Court to the entire DVD and tell the Court to go find it." *Id.*

In response, Ms. Swan identified the specific place in the DVD where Deputy Reardon searches her cellphone. *Recons. Mot.* at 2-3. The Court found the referenced portion of the DVD. At 18:51 in file 2, Deputy Reardon picks up Ms. Swan's cellphone from the desk. *Gov't's Ex.* 11. As Ms. Swan points out, Deputy Reardon's back blocks the view of exactly what he is doing; however, at 19:00, he moves and it is clear that he has opened the cellphone and is examining a screen. *Id.* As he is doing so, Carol Swan says: "It's all in the records from the phone company." Deputy Reardon responds, "Yeah." Lieutenant Bucknam remarks: "Well and that but also, I mean, all the calls she has made, it's going to be on there." Deputy Reardon says, "Yeah. Yeah,

it is." Lieutenant Bucknam says: "I mean, she utilized the phone." Deputy Reardon appears to close the phone at 19:18 and returns it to the table at 19:20.

The Court gleans from this episode that Deputy Reardon opened the phone, possibly found the file where Ms. Swan's telephone calls were listed and scrolled down the screen to confirm that the cellphone had recorded the numbers that she had called, shut the phone, and returned it to the table. Assuming that this brief—at most thirty-second—search of Ms. Swan's cellphone constituted a search under *Riley v. California*, 134 S. Ct. 2473 (2014), the question is whether it mattered.

Again, there is nothing in the record to suggest that the results of that search were admitted into evidence at either trial. Ms. Swan's earlier reference to admitted call logs was simply erroneous. In its October 22, 2014 Order, the Court noted that although Ms. Swan had argued that Ms. Swan's cellphone logs were admitted into evidence, the Court reviewed the exhibit lists for both trials and found "no indication that the Government introduced Ms. Swan's cellphone call log into evidence." *Order* at 29. The Court concluded that "the Government, not Ms. Swan, is correct". *Id.* at 30. Accordingly, this Court pointed out that even if Ms. Swan's phone was searched, it was of little consequence because no evidence from that search was admitted at trial. *Id.* at 29-30.

In her reply, Ms. Swan asserts that during their February 3, 2011 interview, Lieutenant Reardon queried Detective Bucknam about a "list" of contractors that they had. *Def.'s Reply* at 4. She says that Lieutenant Reardon determined that "they did not need to keep Carole's cell phone 'as evidence' because they had a list of call

logs." *Id.* She then asserts that "[f]rom that list of calls made by Carole came the names of two contractors who testified for the government at trial: Earl Vannah and Ruben (or Reuben) Bartlett (Bartlette)." *Id.*

Ms. Swan's contention is apparently that law enforcement obtained the names of Earl Vannah and Reuben Bartlett either from Deputy Reardon's search of Ms. Swan's cellphone or from some undefined earlier search of her cellphone and that law enforcement later used those names to secure their trial testimony. Bluntly put, there is no evidence at all to support this allegation. To the contrary, Lieutenant Reardon refers to a "list" and Detective Bucknam says it is "in the car I think." *Brown & Meyers Tr.* at 40:23-24. If Detective Bucknam had left a list of town contractors in his car, Lieutenant Reardon did not get the list from a cellphone search earlier in the interview of Ms. Swan's cellphone. There is no evidence to support Ms. Swan's assertion that law enforcement obtained the "list" of prior contractors from her call log. In fact, there is no evidence that this "list" ever existed, and if it did, it would be unremarkable that the deputies, who were investigating Ms. Swan's extortion of Frank Monroe for using her influence as a selectman for the town of Chelsea, would have discovered who had previously held the contracts to determine whether there were any earlier victims of Ms. Swan's extortion. After all, the prior contractors were a matter of public record and Frank Monroe, who was cooperating with law enforcement, would presumably have known the names of his competitors.

More to the point, during the interview, Carole Swan herself volunteered the names Earl Vannah and Reuben Bartlett as prior contractors. *Id.* 41:4-11; 41:15-19. The deputies begin questioning Ms. Swan about the prior contractors:

> Sgt. Reardon: Let's go back to the contractor before Frank. Let's go back to him. Did they all work the same way?
> Ms. Swan: Who, this - - that plowed the roads, Vannah?

*Id.* 40:18-22. The officers then discuss the "list":

> Sgt. Reardon: Was it - - do you have that list?
>
> Det. Bucknam: It's in the car I think.
>
> Sgt. Reardon: Okay. I might have gave it to - -
>
> Det. Bucknam: - - video.
>
> Sgt. Reardon: Okay.
>
> Det. Bucknam: Let me check.

*Id.* 40:23-41:3. This part of the conversation is a bit garbled. Neither officer ever says what the list contained. It may be that the "list" was a list of prior contractors or the officers may have been referring to something completely different.

However, as the conversation continued, it becomes clear that the officers do not even know the first name of the earlier plowing contractor:

> Sgt. Reardon: I am trying to get a rough figure for him. How'd that one work? Did it work - -
> Ms. Swan: Vannah?
> Sgt. Reardon: Yeah. How did he - -
> Ms. Swan: I didn't get anything from Vannah.
> Sgt. Reardon: Which one - - was it Tom or Tim? Vannah. Because - -
> Ms. Swan: Earl Vannah?
> Sgt. Reardon: Yeah.
> Ms. Swan: Yeah. I didn't get anything from Earl Vannah.

*Id.* 41:4-14.  The conversation goes on:

> Sgt. Reardon:  Okay.  What other contractors?  You said there was one -
> - that       there was one that you were familiar with back several years
> ago that - -
> Ms. Swan:  Rubin Bartlett that worked for Farriello.
> Sgt. Reardon:  And that was just a few hundred dollars at a time?
> Ms. Swan:  Yeah.
> Sgt. Reardon:  Okay.  What's the most that you've ever taken?
> Ms. Swan:  Frank.

*Id.* 41:15-25.  The transcript reveals that Ms. Swan gave the names of the prior
contractors to the deputies during the February 3, 2011 interview.  In light of this
transcript, the Court is mystified as to why Ms. Swan is now contending that they got
the names of Earl Vannah and Reuben Bartlett from a search of her cellphone.

There is simply no evidence that law enforcement procured those names from
a search of Ms. Swan's cellphone and no evidence that anything Lieutenant Reardon
saw during his quick scan of her cellphone was ever admitted into evidence at the
suppression hearing, at the July trial or at the September trial.  Because evidence
from the cellphone search was never part of this case, it cannot constitute "close
question" on appeal.

### D.    The Custodial Issue

Ms. Swan's renewed argument regarding whether the February 3, 2011
interview was custodial is likewise based on alleged revelations in the Brown &
Meyers transcript.  But whether Ms. Swan was in custody at the Sheriff's Office has
been reviewed by this Court and the Magistrate Judge in multiple Orders, *see Order
on Second Bail Mot.* at 9-10, and Ms. Swan cites no case law to support any of her
new contentions.  Given the Court's discussion and related denial of Ms. Swan's

18

motion to supplement the record to include the Brown & Meyers transcript, the Court rejects Ms. Swan's renewed argument regarding custody.

However, even if the new "enhanced audio" transcript were included in the record, Ms. Swan's argument that Detective Bucknam created a custodial situation when he did not return her cellphone within a minute of saying he would is of little consequence. Whether Detective Bucknam said "in a minute" or "soon," the distinction does not turn the interview into a custodial interrogation. Furthermore, the fact that the detective did not return Ms. Swan's cellphone is evident in the video without the aid of the enhanced audio transcript, and both the Magistrate Judge and this Court examined the entire video.

Finally, regarding her argument about the "confession" statement, there is no material difference between the Government's transcript and the Brown & Meyers transcript. The Government transcript reads:

> RR: Go to the one before that. (UI) Think of this as confession, okay?
> CS: (laughs)
> RR: Seriously because the more we know, Carole, the less that we're surprised about, the better it is cause then we can go the D.A. and say (UI) we got this, this, and this.

*Gov't* Ex. 11-T at 33. The Brown & Meyers transcript reads:

> Sgt. Reardon: May - - think of this as confession, okay? No seriously. I mean, because the more we know, Carole, and the less that we're surprised about, the better it is because then we can go to the D.A. and say we got this, this, and this.

*Brown & Meyers* 44:6-10. Here, although it contains some unintelligibles, the Government transcript is slightly more accurate, because it includes Ms. Swan's laugh, which is audible on the DVD, and places into context, Deputy Reardon's

comment, "No seriously" or "Seriously" response. Significantly, both transcripts agree that Lieutenant Reardon said "think of this as confession, okay?" The Court reviewed this part of the DVD and agrees that both the Government and Ms. Swan's transcripts are accurate on this point.

In referring to confession, Lieutenant Reardon was referring to the Roman Catholic sacrament of Confession, urging Ms. Swan to come clean so that the officers could represent that she had been truthful with the District Attorney. This was a different way of saying to Ms. Swan what the officers had been saying since the outset of the interview: that she had to tell them the truth.

In her motion for reconsideration, however, Ms. Swan—either consciously or not—misquotes the confession statement in the transcripts. She changes the statement in a subtle, but important way. She says that the transcript says: "May . . . think of this as *a* confession." *Recons. Mot.* at 5 (emphasis supplied) ("Reardon clearly is heard instructing Ms. Swan: 'May . . . think of this as a confession, OK?'"). Ms. Swan's addition of an "a" alters the meaning of Lieutenant Reardon's statement by changing it from a "good for the soul" comment to an instruction that she make a formal criminal confession, which—if true—would enhance her contention that the interview was custodial. In fact, she argues that "[t]hat the government considered the 'interview' a confession speaks volumes to the question of custody." *Id.* at 6. But to the extent it relies on a misrepresentation of the contents of the transcripts, Ms. Swan's argument falls hard of its own weight.

This Court has exhaustively addressed the custodial nature of the February 3, 2011 interview and has repeatedly concluded that the interview was not custodial. *Recommended Decision on Mot. to Suppress* (ECF No. 85); *Order Affirming the Recommended Decision of the Magistrate Judge on Mot. to Suppress* (ECF No. 104); *Order Denying Emergency Mot. for Release Pending Appeal* (ECF No. 392). The points that Ms. Swan has raised in this motion for reconsideration are flat-out erroneous, unsupported by anything in the record, or too insubstantial to tip the scales in favor of a finding of "custodial interrogation."

## IV. CONCLUSION

The Court DENIES the Appellant's Motion to Expand Record (ECF No. 394) and Motion for Reconsideration of This Court's Finding That the Cell Phone Was Not Searched (ECF No. 395) as supplemented (ECF No. 396).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 13th day of November, 2014